UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| NICHOLAS PAPAZISSIS, | **15-CV-05695** |
| PLAINTIFF | **COMPLAINT** |
| --AGAINST-- | |
| THE CITY OF NEW YORK, NEW YORK POLICE DEPARTMENT, POLICE OFFICER JOAN HIDALGO, JOHN OR JANE DOES 1-10 (UNIDENTIFIED MEMBERS OF THE NYPD INVOLVED IN PLAINTIFF'S ARREST AND PROSECUTION), | **JURY TRIAL DEMANDED** **ECF CASE** |
| DEFENDANTS. | |

## **PRELIMINARY STATEMENT:**

This is a civil rights action to recover money damages arising out of defendants'
violation of plaintiff Nicholas Papazissis ("Nicholas") rights as secured by the Civil
Rights Act, 42 U.S.C. Section 1983, and of rights secured by the First, Fourth, Fifth,
Eighth and Fourteenth Amendments to the United States Constitution as well as the
laws of the State of New York and to recover monies for personal injuries.

Nicholas was deprived of his constitutional and common law rights when the
individual defendants unlawfully confined Nicholas, caused the unjustifiable arrest and
detainment of Nicholas, in violation of the Fourth and Fourteenth Amendments to the
United States Constitution as well as New York State Laws, defendants caused severe
and permanent personal injuries to Nicholas.

## **JURISDICTION:**

This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the First, Fourth, Fifth,
Eighth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is

conferred upon this Court by 28 U.S.C. §§ 1331, 1342 (3) and (4) and the aforementioned statutory and constitutional provisions.

## VENUE:

Venue is proper for the United States District Court for the Eastern District of New York pursuant to 28 U.S.C. § 1391, (a), (b) and (c) and § 1402 (b) because the claims arose in this district.

## PARTIES:

1.      Nicholas is a citizen of the United States and a resident of the County of Queens in the City and State of New York.

2.      Defendant Police Officer Joan Hidalgo and Police Officers John Does # 1-10 (unidentified members of the New York City Police Department ("Police Officers")), are and were at all times relevant herein officers, employees, and agents of the New York City Police Department.

3.      Police Officer Joan Hidalgo and Police Officers are being sued in both their individual and official capacities.

4.      At all times relevant herein, Police Officer Joan Hidalgo and Police Officers were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the New York City Police Department, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties. Police Officer Joan Hidalgo and Police Officers were acting for and on behalf of the New York City Police Department at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the New York City Police Department and incidental to

the lawful pursuit of their duties as officers, employees and agents of the New York City Police Department.

5. Defendant City of New York is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant City of New York assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the New York City Police Department.

## **STATEMENT OF FACTS:**

6. On or about July 3, 2014 at around 8:00P.M., Nicholas was/ was caused to be assaulted, battered and falsely and improperly arrested, without a warrant, at or near 29-35 162nd Street, in the County of Queens and State of New York.

7. During the arrest, Nicholas was physically assaulted by police officers, which led to severe and permanent injuries.

8. Police Officer Joan Hidalgo and Police Officers observed Nicholas have his constitutional rights violated and did nothing to prevent his unjustifiable false arrest and imprisonment and the physical injuries.

9. Nicholas's false arrest and false imprisonment by Police Officer Joan Hidalgo and Police Officers caused Nicholas to sustain psychological and emotional trauma, and physical injuries.

10. Nicholas was confined for about 1 day, or until July 4, 2014.

11. Nicholas was unable to work as a result of injuries sustained from

- 3 -

the date of the assault until on or about May 2015.

12.     Nicholas continues to have disabilities, and experience physical pain from the events.

## FIRST CAUSE OF ACTION:

### 42 U.S.C. § 1983 Federal Civil Rights Violations

13.     Nicholas repeats and realleges each and every allegation above as if fully set forth herein.

14.     All of the aforementioned acts of defendants, their agents, servants and employees were carried out under the color of law.

15.     All of the aforementioned acts deprived Nicholas of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and constitute violations of 42 U.S.C. §1983.

16.     The acts complained of were carried out by Police Officer Joan Hidalgo and Police Officers in their capacities as police officers, with all the actual and/or apparent authority attendant thereto.

17.     The acts complained of were carried out by Police Officer Joan Hidalgo and Police Officers in their capacities as detectives and police officers, pursuant to the customs, usages, practices, procedures, and rules of the defendant City of New York and the New York City Police Department, all under the supervision of ranking officers of said department.

18.     Defendants, collectively and individually, while acting under color of state law, engaged in conduct which constituted a custom, usage, practice,

- 4 -

procedure or rule of their respective municipality/authority, which is forbidden by the Constitution of the United States.

## SECOND CAUSE OF ACTION:

### State Law False Imprisonment and False Arrest

19.     Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

20.     By their conduct, as described herein, the individual defendants are liable to plaintiff for falsely imprisoning and falsely arresting them.

21.     Plaintiff was conscious of his confinement.

22.     Plaintiff did not consent to his confinement.

23.     Plaintiffs' confinement was not otherwise privileged.

24.     Defendant City of New York, as an employer of the individual defendant officers, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

25.     As a direct and proximate result of the misconduct and abuse of authority stated above, plaintiff sustained the damages alleged herein.

## THIRD CAUSE OF ACTION:

### Fourth Amendment and Fourteenth Amendment Violations

26.     Nicholas repeats and realleges each and every allegation above as if fully set forth herein.

27.     Police Officer Joan Hidalgo and Police Officers, acting in concert and within the scope of their authority, arrested and caused Nicholas to be

- 5 -

imprisoned without probable cause in violation of Nicholas's right to be free of an unreasonable seizure under the Fourth Amendment of the Constitution of the United States.

28.      Further, Police Officer Joan Hidalgo and Police Officers, acting in concert and within the scope of their authority, arrested and caused Nicholas to be imprisoned without probable cause in violation of Nicholas's right to be free of a deprivation of liberty under the Fourteenth Amendment to the Constitution of the United States, in addition to suffering the injuries hereinbefore alleged.

### FOURTH CAUSE OF ACTION
### Unreasonable Force

29.      Plaintiff Nicholas repeats and realleges each and every allegation as if fully set forth herein.

30.      The defendants violated the Fourth and Fourteenth Amendments because they used unreasonable force on Nicholas.

31.      As a direct and proximate result of this unlawful conduct, plaintiff, Nicholas, sustained the damages hereinbefore alleged.

### FIFTH CAUSE OF ACTION:
### False Arrest – Federal Claim

32.      Nicholas repeats and realleges each and every allegation above as if fully set forth herein.

33.      The defendants' acts and conduct constitute false arrest and false imprisonment under the Fourth Amendment to the United States Constitution.

- 6 -

Police Officer Joan Hidalgo and Police Officers intended to and did confine Nicholas and Nicholas was conscious of that confinement.

34. Additionally, Nicholas did not consent to the confinement and the confinement was not otherwise privileged.

35.     Police Officer Joan Hidalgo and Police Officers were at all times agents, servants, and employees acting within the scope of their employment by the City of New York and the New York City Police Department, which are therefore responsible for their conduct.

36. As a direct and proximate result of this unlawful conduct, Nicholas's liberty was restricted for an extended period of time, he was put in fear for his safety, humiliated and subjected to handcuffing, and other physical restraints, without probable cause, in addition to suffering the injuries herein alleged.

## SIXTH CAUSE OF ACTION:
### Failure to Intervene

37.     Nicholas repeats and realleges each and every allegation above as if fully set forth herein.

38.     Police Officer Joan Hidalgo and/or those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity to prevent such conduct, had a duty to intervene and prevent such conduct.

39.     Police Officer Joan Hidalgo and/or those defendants that were present but did not actively participate in the aforementioned violation of Nicholas's

- 7 -

constitutional rights failed to intervene to prevent the unlawful conduct described above.

40.     As a direct and proximate result of the foregoing, Nicholas's liberty was restricted for an extended period of time, he was put in fear of his safety, and he was humiliated and subjected to other physical constraints.

41.     Accordingly, those defendants who failed to intervene violated the First, Fourth, Fifth, Eighth And Fourteenth Amendments

42.     Police Officer Joan Hidalgo and Police Officers were at all times agents, servants, and employees acting within the scope of their employment by the defendant City of New York and the New York City Police Department, which are therefore responsible for their conduct.

## SEVENTH CAUSE OF ACTION:
### Denial of Constitutional Right to Fair Trial

43.     Nicholas repeats and realleges each and every allegation above as if fully set forth herein.

44.     Police Officer Joan Hidalgo and Police Officers, as officers of the New York City Police Department and Defendant City of New York as a municipal entity created and authorized under the laws of the State of New York, were acting under the color of law.

45.     Police Officer Joan Hidalgo and Police Officers created false evidence against Nicholas.

46.     Police Officer Joan Hidalgo and Police Officers forwarded false evidence to prosecutors at the New York County District Attorney's office.

47.     In creating false evidence against Nicholas, and in forwarding

false information to prosecutors, the individual defendants violated Nicholas's constitutional right to a fair trial under the Due Process Clause of the Fifth and Fourteenth Amendments of the United States Constitution, depriving him of rights, privileges, and immunities secured by the Constitution, which were clearly established at the time of the violation.

48.    Police Officer Joan Hidalgo and Police Officers were at all times agents, servants, and employees acting within the scope of their employment by the City of New York and the New York City Police Department, which are therefore responsible for their conduct

49.    As a direct and proximate result of this unlawful conduct, Nicholas sustained the damages hereinbefore alleged.

## EIGHTH CAUSE OF ACTION

### Negligent Hiring/Training/Retention

52.    Plaintiff repeats and realleges each and every allegation as if fully set forth herein.

53.    Defendant City, through the NYPD, owed a duty of care to plaintiffs to prevent the conduct alleged, because under the same or similar circumstances a reasonable, prudent, and careful person should have anticipated that injury to plaintiffs or to those in a like situation would probably result from the foregoing conduct.

54.    Upon information and belief, all of the individual defendants were unfit and incompetent for their positions.

55.    Upon information and belief, defendant City knew or should have

- 9 -

known through the exercise of reasonable diligence that the individual defendants were potentially dangerous.

56.     Upon information and belief, defendant City's negligence in screening, hiring, training, disciplining, and retaining these defendants proximately caused each of plaintiffs' injuries.

57.     As a direct and proximate result of their unlawful conduct, plaintiff sustained the damages hereinbefore alleged.

## NINTH CAUSE OF ACTION
## Deliberate Indifference to Safety/Medical Needs

58.     Plaintiff Nicholas repeats and realleges each and every allegation as if fully set forth herein.

59.     The individual defendants were aware of a risk to plaintiff's safety and a need for medical care and failed to act in deliberate indifference to plaintiff's needs.

60.     Accordingly, defendants violated the fourteenth amendment because they acted with deliberate indifference to plaintiff's medical needs and safety.

61.     As a direct and proximate result of this unlawful conduct, Plaintiff sustained the damages hereinbefore alleged.

## TENTH CAUSE OF ACTION:
## *Monell* Claim

62.     Police Officer Joan Hidalgo and Police Officers committed the aforementioned violations in their capacities as detectives and police officers and

officials pursuant to customs, policies, usages, practices, procedures and rules of the defendant City of New York and the NYPD, and under the supervision of ranking officers of the NYPD.

63. The customs, practices, procedures and rules of the defendant City of New York and the NYPD include, but are not limited to: 1) arresting persons known to be innocent in order to meet "productivity goals"; 2) falsely swearing out criminal complaints and/or lying and committing perjury during sworn testimony to protect other officers and meet productivity goals;

3) failing to supervise, train, instruct and discipline police officers thereby encouraging their misconduct and exhibiting deliberate indifference towards the constitutional rights of persons within the officers' jurisdiction; 4) discouraging police officers from reporting the corrupt or unlawful acts of other officers; 5) retaliating against officers who report police misconduct; and

6) failing to intervene to prevent the above-mentioned practices when they reasonably could have been prevented with proper supervision.

64. At the time of the aforementioned constitutional violations, the defendant City of New York and the NYPD were and had been on notice of such unconstitutional conduct, customs, and *de facto* policies, such that the failure of the defendant City of New York and the NYPD to take appropriate remedial action amounted to deliberate indifference to the constitutional rights of persons with whom the police come in contact. In light of the extensive pattern of well-settled, pervasive customs and policies causing constitutional violations, documented in part *infra*, the need for more effective supervision and other remedial measures was patently obvious, but the defendant City of New York and NYPD made no meaningful attempt to prevent future constitutional violations.

65. The existence of aforesaid unconstitutional customs and policies may be inferred from **repeated occurrences of similar wrongful conduct**, as documented by

- 11 -

the following civil rights actions and parallel prosecutions of police officers:

> a. Schoolcraft v. City of New York, 10-CV-6005 (RWS)
> (S.D.N.Y)(police officer who exposed a precinct's polices and practices of
> illegal quotas for the issuance of summonses and arrests,
> falsifying evidence and suborning perjury alleges he was arrested
> and committed to a psychiatric facility in retaliation for exposing
> these practices and customs);

b. Long v. City of New York, 09-CV-6099 (AJK)(S.D.N.Y); People v.
Pagan, 6416-2008 (Sup. Ct. N.Y. Co.)(officer swears out a false complaint
and is convicted of falsifying police records);

c. Taylor-Mickens v. City of New York, 09-CV-7923
(RWS)(S.D.N.Y)(police officers at 24th precinct issue four summonses to
a woman in retaliation for her lodging a complaint with the Civilian
Complaint Review Board against the precinct);

d. Lin v. City of New York, 10-CV-1936 (PGG)(S.D.N.Y) (officers
arrest a person lawfully photographing an arrest of a bicyclist in Times
Square and swear out criminal complaints that are contradicted by video
evidence);

e. Colon v. City of New York, 9-CV-0008 (JBW)(E.D.N.Y) (in an Order
dated November 29, 2009 denying the City's motion to dismiss on
Iqbal/Twombley grounds, wherein the police officers at issue were
prosecuted for falsifying evidence, the Honorable Jack B. Weinstein
wrote:

> 'Informal inquiry by the court and among the judges of
> this court, as well as knowledge of cases in other federal
> and state courts, has revealed anecdotal evidence of
> repeated, widespread falsification by arresting police
> officers of the New York City Police
> Department. Despite numerous inquiries by
> commissions and strong reported efforts by the present
> administration—through selection of candidates for the
> police force stressing academic and other qualifications,
> serious training to avoid constitutional violations, and
> strong disciplinary action within the department—there
> is some evidence of an attitude among officers that is
> sufficiently widespread to constitute a custom or policy
> by the city approving illegal conduct of the kind now
> charged.'

f. People v. Arbeedy, 6314-2008 (Sup. Ct. Kings Co.) (NYPD
narcotics detective found guilty planting drugs on two innocent
civilians; former undercover NYPD narcotics officer, Steve
Anderson, testified that fellow narcotics officers routinely maintained

a stash of narcotics to plant on innocent civilians in order to help those officers meet arrest quotas; Mr. Anderson testified concerning the NYPD's practice of "attaching bodies" to the narcotics to make baseless arrests stating: "It was something I was seeing a lot of, whether it was from supervisors or undercovers and even investigators. Seeing it so much, it's almost like you have no emotion with it. The mentality was that they attach bodies to it, they're going

to be out of jail tomorrow anyway, nothing is going to happen to them anyway. That kind of came to me and I accepted it – being around so long, and being an undercover"; The presiding judge, Justice Reichbach, stated "Having been a judge for 20 years, I thought I was not naïve regarding the reality of narcotics enforcement. But even the Court was shocked, not only by the seeming pervasive scope of the misconduct, but even more distressingly by the seeming casualness by which such conduct is employed.");

g. Bryant v. City of New York, 22011/2007 (Sup. Ct. Kings Co.)(Jury declares that NYPD officers acted pursuant to a City policy regarding the number of arrests officers were expected to make that violated plaintiff's constitutional rights and contributed to her arrest);

h. Williams v. City of New York, 06-CV-6601 (NGG) (E.D.N.Y.)(officers arrest plaintiff during a "vertical patrol" of a public housing project despite evidence that he had a legitimate reason to be on premises);

i. MacNamara v. City of New York, 04-CV-9216(RJS)(JCF) (S.D.N.Y) (evidence of perjured sworn statements systematically provided by officers to attempt to cover up or justify unlawful mass arrests of approximately 1,800 people has been and continues to be developed in the consolidated litigation arising out of the 2004 Republican National Convention);

j. McMillan v. City of New York, 04-CV-3990 (FB)(RML) (E.D.N.Y.)(officers fabricated evidence against an African-American man in Kings County and initiated drug charges against him, despite an absence of a quantum of suspicion);

k. Avent v. City of New York, 04-CV-2451 (CBA) (CL) (E.D.N.Y.)(same);

l. Smith v. City of New York, 04-CV-1045 (RLM) (E.D.N.Y.) (same);

m. Powers v. City of New York, 04-CV-2246 (NGG) (E.D.N.Y.)(police officer alleges unlawful retaliation by other police officers after testifying about corruption in the NYPD);

n. Nonneman v. City of New York, 04-CV-10131 (JSR)(AJP)

- 13 -

(S.D.N.Y.)(former NYPD lieutenant alleging retaliatory demotion and early retirement after reporting a fellow officer to IAB and CCRB for the officer's suspicion-less, racially-motivated stop-and-frisk of a group of Hispanic youths);

o. Richardson v. City of New York, 02-CV-3651 (JG)(CLP)
(E.D.N.Y.)(officers fabricated evidence including knowingly false sworn
complaints, against an African-American man in Kings County and
initiated drug charges against him, despite an absence of any quantum of
suspicion);

p. Barry v. City of New York, 01-CV-10627 (CBM) (S.D.N.Y.)(triable
issue of fact where NYPD sergeant alleged retaliatory demotion and
disciplinary charges in response to sergeant's allegations of corruption
within her unit and alleged the NYPD had an "unwritten but persuasive
custom of punishing officers who speak out about police misconduct and
encouraging, if not facilitating, silence among officers");

q. White-Ruiz v. City of New York, 93-CV-7233 (DLC) (MHD), 983
F.Supp. 365, 380 (S.D.N.Y., 1997)(holding that the NYPD had an
"unwritten policy or practice of encouraging or at least tolerating a pattern
of harassment directed at officers who exposed instances of police
corruption"); and

r. Ariza v. City of New York, 93-CV-5287 (CPS), 1996 U.S. Dist. Lexis
20250 at 14(E.D.N.Y.)(police officer alleges retaliatory duty assignments
and harassment in response to her allegations about a racially-
discriminatory workplace; on motion for summary judgment, the Court
held that the police officer had established proof of both a widespread
usage of policy to regulate against police officers who exposed police
misconduct and a failure to train in the police department).

66.     The existence of the aforesaid unconstitutional customs and practices, **specifically**

**regarding the practice or custom of officers lying under oath, falsely swearing out criminal**

**complaints or otherwise falsifying or fabricating evidence**, are further evidenced, *inter alia*,

by the following:

a. The Mollen Commission concluded that police perjury and falsification of
official records is likely the most common form of police corruption facing the
criminal justice system. It concluded:

Regardless of the motives behind police falsifications, what is
particularly troublesome about this practice is that it is widely
tolerated by corrupt and honest officers alike, as well as their
superiors. Corrupt and honest officers told us that their supervisors
knew or should have known about falsified versions of searches and
arrests and never questioned them.[1]

{...}

- 15 -

> What breeds this tolerance is deep-rooted perception among many officers of all ranks within the Department that there is nothing really wrong with compromising the facts to fight crime in the real world. Simply put, despite devastating consequences of police falsifications, there is a persistent belief among officers that it is necessary and justified, even if it is unlawful. As one dedicated officer put it, police officers often view falsification as, to use her words, "doing God's work" – doing whatever it takes to get the suspected criminal off the streets. This is so entrenched, especially in high-crime precincts, that when investigators confronted one recently arrested officer with evidence of perjury, he asked in disbelief, "What's wrong with that? They're guilty."[2]

b. In June 2011, in the case in New York County Supreme Court entitled People v. William Eiserman, (Ind. No. 2999-2010), NYPD Sergeant William Eiseman pled guilty to perjury and falsifying police records, "admit[ing] to faking a marijuana case against one man and cocaine-related charges against another – and training Velasquez [officers] to falsify paperwork to sidestep legal safeguards." Supreme Court Justice Juan Merchan commented that Sgt. Eisenman's admissions "paint a picture of a police officer who has challenged and undermined the integrity of the entire system we have here."[3]

c. In late 2009, a former NYPD officer in the Bronx, Pedro Corniel, was charged with perjury for claiming to have caught a burglar "red-handed" when, in fact, two other officers had made the arrest and handed the arrest off to Corniel. The suspect was released.[4] Moreover,

> Prosecutors and NYPD Internal Affairs probers have identified as many as two dozen cases in the past year in which cops allegedly made false statements involving routine arrests when the truth would have served them just as well.
>
> That is a significant increase over previous years, sources said. "In the past, we'd find this happening once or twice a year, and now there are a bunch of them," said one law-enforcement official.
>
> What has authorities particularly troubled is that officers historically lied to cover up more serious corruption, such as the cadre of Brooklyn narcotics cops caught stealing drugs from dealers and masking their thievery by filing false reports about what they had seized.
>
> But internal probers are now finding that officers appear willing to take insidious shortcuts and lie on arrest reports when they are processing even routine collars, such as grand larceny, burglaries and robberies, sources told The Post.

> Their reasons could range from trying to cut down on
> paperwork to being lazy when filing arrest and incident
> reports.[5]

d.      In 2007, former NYPD Officer Dennis Kim admitted to accepting money
and sexual favors from the proprietor of a brothel in Queens County in exchange
for protecting that brothel. Mr. Kim was convicted of those offenses. The
109th precinct of the NYPD, which used to be under Mr. Kim's command, is also
under investigation by the United States Attorney's Office for "planting drugs on
suspects and stealing cash during gambling raids." The 109th precinct is believed
to be involved in a practice known as "flaking" wherein police officers plant
drugs on suspects in order to bring legitimacy to the arrest. According to the
Assistant United States Attorney Monica Evans, members of the 109th Precinct
"maintained a small stash of drugs in an Altoids tin for this purpose."[6]

e.      In December 2009, two officers from the 81st Precinct in Brooklyn arrested
and falsely swore out charges against an undercover officer from Internal Affairs
Bureau.  As explained in the New York Post:

> The officers were snared in a sting by Internal Affairs in
> December when they were told to keep an eye out for people
> selling untaxed cigarettes in their precinct.
>
> Sometime later, they saw a man hanging out on a corner in the
> neighborhood and found that he was carrying packs of knock-
> off smokes.
>
> [Sgt. Raymond] Stukes, 45, and [Officer Hector] Tirado, 30
> cuffed him, but they claimed that they had seen him selling the
> bogus butts to two people, according to sources.
>
> Little did the hapless cops know that the man in their custody
> was an undercover corruption investigator and that the whole
> incident was caught on video.
>
> To complete ruse, the undercover cop was processed at the
> station house so as not to tip off Stukes and Tirado about the
> sting…
>
> [P]olice sources said [this action] stem[s] from precinct
> commanders caving to the pressure of top brass to make
> themselves look better.
>
> "There's pressure      on the cops from the bosses and
> they're  getting pressured from headquarters," a police source
> told The Post.

The officers were indicted for felony perjury, filing a false report and filing a
false instrument.[7]

f. In early 2010, the City settled a civil rights lawsuit wherein one Officer Sean. Spence falsely arrested and accused a 41-year-old grandmother of prostitution, promising to pay the woman $35,000. In Court documents, Caroline Chen, the attorney representing the City in the case, admitted: "Officer Spencer falsely reported to the assistant district attorney that he saw [the plaintiff] beckon to three male passersby and that he was aware that plaintiff was previously arrested for [prostitution] when the plaintiff had never been arrested forther offense."[8]

g. Separate grand jury investigations into drug-related police corruption in the Bronx; and Manhattan revealed that more than a dozen office rs had been breaking into drug dealers' apartments, stealing and then selling thei r drugs and perjuring themselves by filing false arrest reports. District attorneys and their assistants interviewed du ring a four month investigation by New York Newsday said they believe those two grand

jury investigations - in the 46th Precinct in the University Heights section of the Bronx and the 34thPrecinct- are not isolated instances. They say the investigat ions reflect a larger, broader problem within the NYPD that its top officials seem unable or unwilling to acknowledge.[9]

67. Furthermore, the existence of the aforesaid unconstitutional customs and policies, specifically with regard to "productivity goals," may be further inferred from the following:

a. Deputy Commissioner Paul J. Browne has repeatedly admitted that NYPD commanders are permitted to set "productivity goals."[10]

b. An NYPD transit lieutenant was captured on tape telling officers to make more arrests to meet a captain's order and do more work if they want overtime assignments. "All they care about is ... summonses and arrests and 250s," Lt. Janice Williams said, using police jargon for the NYPD Stop, Question and Frisk reports. She added, "'The bottom line is everybody's individual activity is being looked at." Later in the recording made during a roll call in 2010 at Transit District 34 in Coney Island - she said only officers with "good productivity" will get the opportunity to work overtime. She also said Capt. James Sheerin wanted every officer to make at least one arrest per month - up from the previous order of one every three months - because crime had spiked and arrest totals were lower than other transit districts. "He wants everyone to get in the mindset that there's no more collar a quarter," Williams said.[11]

c. NYPD Officer Adil Polanco has asserted that her command, the 41st Precinct, regularly requires officers to make at least "one arrest and twenty

summonses" per month. P.O. Polanco's allegations were confirmed by an
audiotape obtained by the media. The contents of the tape reveal that these quotas
are enforced through coercion and threats of job loss; to wit, a patrol supervisor at
the 41st Precinct is overheard saying: "If you think one and 20 is breaking your
balls, guess what you'll be doing. You're gong (sic) to be doing a lot more, a lot
more than what they're saying." The tape also reveals that another patrol
supervisor chimed in and told the officers: "next week, 25 and one, 35 and one,
and until you decide to quit this job and go to work at Pizza Hut, this is what
you're going to be doing till (sic) then."[12]

d.      The New York Daily News obtained and published two internal memos
which were posted inside the roll-call room at the NYPD's 77th Precinct. The
memos specifically instructed officers about the "number of tickets to give drivers
for cell phone, seat belt, double-parking, bus stop, tinted windows and truck route
violations" that they were expected to issue. The memos remained posted for
several weeks inside the roll-call room until the media began inquiring. [13]

e.      Responding to a query from a civilian who was cited on consecutive
days in November of 2009 for allegedly occupying more than one seat on the
New York City subway, the officer responded: "Recently we've been told to write
tickets instead of give warnings for this type of thing." The officer explained that
they needed to meet quotas. [14]

f.      In December of 2010 and in response to the pressure from their supervisors
to issue baseless summonses pursuant to the policy and practice of quotas, police
officers at the 79th Precinct considered organizing a so-called "daylong summons
boycott." As one officer at the precinct explained, "Nobody feels this is right,
asking us to write summonses just to meet a quota."[15]

g.      In response to the planned summons-boycott at the 79th Precinct on
December 13, 2010, Deputy Chief Michael Marino marched into the precinct at
roll call with a deputy inspector and read officers the riot act. "Just try it," a police
source quoted Marino as saying. "I'll come down here and make sure you write
them." Marino also vowed to transfer people, like he did when he was the
commanding officer of the 75th Precinct in East New York.[16]

h.      Capt. Alex Perez, the second in command at the NYPD's 8151 Precinct,
testified in a civil matter before a Brooklyn Supreme Court jury that officers are
likely to get poor performance ratings if they have few arrests, conceding that that
arrest numbers are a factor in evaluating an officer's performance.[17] Ultimately,
the jury in that case judged that the police and a policy "regarding the number of
arrests officers were to make that violated plaintiffs constitutional rights and
contributed to her arrest."[18]

i.      The New York City Office of Collective Bargaining concluded that officers
in Brooklyn's 75th Precinct were required to issue four parking tickets, three
moving violation citations; three "quality-of-life" summonses, make one arrest
and two stop-and-frisks each month. Arbitrator Bonnie Siber Weinstock ruled that
the NYPD maintained an illegal "summons quota for traffic violations in the

precinct and by penalizing officers for failing to meet the stated number of traffic citations." She ordered the city to cease and desist from the practice.[19]

j.      Kieran Creighton, commander of the NYPD Housing Police Service Area 8 in the northern Bronx, was investigated for ordering officers to make a certain number of arrests each month. According to The New York Daily News:

> The incident allegedly occurred in the spring when Creighton ordered at least eight members of an undercover anti-crime team to a meeting in Pelham Bay Park to berate them about an alleged lack of arrests, sources said.

> 'You can't make the nine collars a month, then we'll all have to go our separate ways," Creighton told the officers, according to an internal complaint obtained by The News. Anything less than nine arrests would be a "personal slap in the face," Creighton allegedly said.

> Creighton then told the cops to finagle the times of arrests so any overtime was paid for by a federally funded anti-drug program, the complaint states.

> Unbeknownst to Creighton, one officer had her NYPD radio switched on so the captain's 10 to 12 minute speech was broadcast to Bronx precincts in Morrisania and Schuylerville and taped by the 911 dispatcher.[20]

68.     The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the failure to supervise, train, instruct, and discipline police officers, encouraging their misconduct, and exhibiting deliberate indifference towards the constitutional rights of persons with whom officers come into contact** are further evidenced, *inter alia*, by the following:

a.      With respect to Fourth Amendment violations, in Ligon v. City of New York, 2013 WL 628534 (Feb. 14, 2013), Judge Scheindlin found that plaintiffs challenging allegedly unconstitutional policies and practices of the NYPD had shown "a clear likelihood of proving deliberate indifference under any of the prevailing ways of framing that standard," including failure to train and constructive acquiescence.[21] Judge Scheindlin specifically rejected the NYPD's argument that broad, general remedial measures taken in 2012, such as an instructional video on stop and frisk, was meaningful action rebutting a finding of deliberate indifference.

b.      The Report of the Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Department ("Mollen Commission Report"), dated July 7, 1994, states:

In the face of this problem [of corruption], the [NYPD] allowed its systems for fighting corruption virtually to collapse. It has become more concerned about the bad publicity that corruption disclosures generate than the devastating

consequences of corruption itself. As a result, its corruption control ignored and at times concealed corruption rather than root it out. Such an institutional reluctance to uncover corruption is not surprising. No institution wants its reputations tainted - especially a Department that needs the public's confidence and partnership to be effective. A weak and poorly resourced anti-corruption apparatus minimizes the likelihood of such taint, embarrassment and potential harm to careers. Thus there is a strong institutional incentive to allow corruption efforts to fray and lose priority - which is exactly what the Commission uncovered. This reluctance manifested itself in every component of the Department's corruption controls from command accountability and supervision, to investigations, police culture, training and recruitment. For at least the past decade, the system designed to protect the Department from corruption minimized the likelihood of uncovering it.[22]

c. Accordingly, in 1990, the Office of the Special Prosecutor, which investigated charges of police corruption, was abolished.

d. In response to the Honorable Judge Weinstein's ruling of November 25, 2009 in Colon v. City of New York, 09-CV-00008 (E.D.N.Y.), in which he noticed a "widespread… custom or policy by the city approving illegal conduct" such as lying under oath and false swearing, NYPD Commissioner Raymond Kelly acknowledged, "When it happens, it's not for personal gain. It's more for convenience."[23]

e. In a recent instance, NYPD officer Lieutenant Daniel Sbarra was involved in 15 suits against the city resulting to date in over $1.5 million in settlement payments, was the target of 5-10 Internal Affairs investigations, and was the subject of at least 30 complaints filed with the Civilian Complaint Review Board. Not only have Commissioner Kelly and the NYPD failed to meaningfully discipline or control officer Sbarra – they promoted him to the rank of Lieutenant four months after he lost 20 days of vacation upon pleading guilty to Internal Affairs charges relating to an unconstitutional search. This shows, at best, deliberate indifference towards the constitutional rights of citizens with whom Sbarra comes into contact, and further demonstrates tacit approval, condonement, and/or encouragement of unconstitutional policies, customs, and practices.[24]

f. Regarding defendant City's tacit condonement and failure to supervise, discipline or provide remedial training when officers engage in excessive force, the Civilian Complaint Review Board is a City agency, allegedly independent of the NYPD, that is responsible for investigating and issuing findings on complaints of police abuse and misconduct.[25] When it does, however, Commissioner Kelly controls whether the NYPD pursues the matter and he alone has the authority to impose discipline on the subject officer(s). Since 2005, during Kelly's tenure, only one quarter of officers whom the CCRB found engaged in misconduct received punishment more severe than verbal "instructions." Moreover, the number of CCRB-substantiated cases that the NYPD has simply dropped (i.e., closed without action or discipline) has spiked from less than 4% each year between 2002 and 2006, to 35% in 2007, and approximately 30% in

2008. Alarmingly, the NYPD has refused to prosecute 40% of the cases sent to it by the CCRB in 2009.[26]  As a result, the percentage of cases where the CCRB found misconduct but where the subject officers were given only verbal instructions or the matter was simply dropped by he NYPD rose to 66% in 2007. Substantiated complaints of excessive force against civilians accounted for more than 10% of the cases that the NYPD dropped in 2007 and account for more than 25% of cases dropped in 2008.[27]

69.     The existence of the aforesaid unconstitutional customs and practices, **specifically with regard to the practice or custom of discouraging police officers from reporting the corrupt or unlawful practices of other police officers and of retaliating against officers who report misconduct**, are further evidenced, *inter alia*, by the following:

a.     In a suit filed in 2012, Officer Craig Matthews alleged that he was systematically retaliated against for speaking to her precinct commanders about the pressure that the NYPD's illegal quota system placed on officers.[28]

b.     In Griffin v. City of New York, 880 F. Supp.2d 384 (E.D.N.Y. 2012), Judge Dearie denied the city's motion to dismiss retaliation claims against a former NYPD detective who, after reporting a fellow officer's misconduct to the NYPD Internal Affairs Bureau, found the word "rat" written multiple times on her locker and faced other repercussions from fellow police officers that her supervisors failed to address.[29]

c.     Former New York County District Attorney Robert Morgenthau has been quoted as acknowledging that, in the NYPD, there is a "code of silence," or a "code of protection" that exists among officers and that is followed carefully;

d.     In 1985, former NYPD Commissioner Benjamin Ward, testifying before a State Senate Committee, acknowledged the existence of the  "code of silence" in the NYPD;

e.     Former NYPD Commissioner Robert Daly wrote in 1991 that the "blue wall of solidarity with its macho mores and prejudices, its cover-ups and silence is reinforced every day in every way."

70.     The existence of the above-described *de facto* unlawful policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officers and officials of the NYPD and the defendant City of New York, including without limitation, Commissioner Bratton.

71.     The actions of Police Officer Joan Hidalgo and Police Officers, resulting from and taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of the defendant City of New York, are implemented by members of the NYPD engaging in systematic and ubiquitous perjury, both oral and written, to cover up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates. They do so with the knowledge and approval of their supervisors, commanders and Commissioner Bratton who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete

stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and the Internal Affairs Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves, fellow office supervisors and/or subordinates against those civilians.

72.     All of the foregoing acts by defendants deprived Nicholas of his federally protected rights, including, but limited to, the constitutional rights enumerated herein.

73.     Defendant City of New York knew or should have known that the acts alleged herein would deprive Nicholas of his rights under the Fourth, Fifth, Eighth and Fourteenth Amendments to the United States Constitution.

74.     Defendant City of New York is directly liable and responsible for the acts of

Police Officer Joan Hidalgo and Police Officers, as it repeatedly and knowingly failed to properly supervise, train, instruct, and discipline them and because it repeatedly and knowingly failed to enforce the rules and regulations of the defendant City of New York and the NYPD, and to require compliance with the Constitution and laws of the United States.

- 21 -

75.     Despite knowledge of such unlawful *de facto* policies, practices, and/or customs, these supervisory and policy-making officers and officials of the NYPD and the City, including Commissioner Bratton, have not taken steps to terminate these policies, practices and/or customs, do not discipline individuals who engage in such polices, practices and/or customs, or otherwise properly train police officers with regard to the constitutional and statutory limits on the exercise of their authority, and instead approve and ratify these policies, practices and/or customs through their active encouragement of, deliberate indifference to and/or reckless disregard of the effects of said policies, practices and/or customs or the constitutional rights of persons in the City of New York.

76.     The aforementioned policies, practices and/or customs of failing to supervise, train, instruct and discipline police officers and encouraging their misconduct are evidenced by the police misconduct detailed herein. Specifically, pursuant to the aforementioned policies, practices and/or customs, Police Officer Joan Hidalgo and Police Officers felt empowered to arrest Nicholas without probable cause and then fabricate and swear to a false story to cover up their blatant violations of Nicholas's constitutional rights. Pursuant to the aforementioned policies, practices and/or customs, the officers failed to intervene in or report Police Officer Joan Hidalgo and Police Officers' violations of Nicholas's rights.

77.     Nicholas's injuries were a direct and proximate result of the defendant City of New York and the NYPD's wrongful *de facto* policies and/or well-settled and widespread customs and practices and of the knowing and repeated failure of the defendant City of New York and the NYPD to properly supervise, train and discipline their police officers.

78.     As a result of the foregoing, Nicholas was deprived of his liberty, endured psychological and emotional injury, humiliation, costs and expenses and suffered other damages and injuries.

## ELEVENTH CAUSE OF ACTION

## ASSAULT

- 22 -

79. Defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously assaulted plaintiff in that they had the real or apparent ability to cause imminent harmful and/or offensive bodily contact and intentionally did a violent and/or menacing act which threatened such contact to the plaintiff, and that such acts caused apprehension of such contact in the plaintiff.

80. Defendants were at all times agents, servants, and employees acting within the scope of their employment by the City of New York and the New York City Police Department, which are therefore responsible for their conduct.

81. The City, as the employer of defendants, is responsible for his wrongdoing under the doctrine of respondeat superior.

## TWELFTH CAUSE OF ACTION

## BATTERY

82. Defendants, their agents, servants and employees, acting within the scope of their employment, intentionally, willfully and maliciously battered plaintiff, when they, in a hostile and/or offensive manner struck plaintiff without his consent and with the intention of causing harmful and/or offensive bodily contact to the plaintiff and caused such battery.

83. Defendants were at all times agents, servants, and employees acting within the scope of their employment by the City of New York and the New York City Police Department, which are therefore responsible for his conduct.

84. The City, as the employer of defendants, is responsible for his wrongdoing under the doctrine of respondeat superior.

- 23 -

## PRAYER FOR RELIEF

**WHEREFORE,** Nicholas prays for relief as follows:

a. That the jury find and the Court adjudge and decree that Nicholas shall recover compensatory damages the sum of $2,000,000 against the individual defendants and the City of New York, jointly and severally, together with interest and costs; and punitive damages in the sum of $1,000,000 against the individual defendants, jointly and severally.

b. That Nicholas recover the cost of the suit herein, including reasonable attorney's fees pursuant to 42 U.S.C. § 1988.

c. That Nicholas have such other and further relief as the Court shall deem just and proper.

Dated:      New York, New York
            October 1, 2015

By: _____

Peter Hanschke, Esq.
LucasHanschke, P.C.
245 5th Avenue, Suite 1902
New York, NY 10016-8716
347-766-6602
peterh@lhalaw.com

_____

illMellen Conunision report, p.36

illMollen Commission Report, pp 40-41.

ill Melissa Grace, *NYPD Sgt. lfV/ia/71 Eiseman Pleads G11il(y to Lyi11g U11det·Oath in Plea Deal,* Daily   ews,June  27,  2011,
available  at  http://www.nydailynews.com  /news/crime/nypd-sgt-william-eiseman-pleads-g:uilt;y-lying-oath-plea-deal-
article-1.129288

- 23-

[4] Murray Weiss, *NYPD in a Liar Storm*, N.Y. Post, Oct. 26, 2009 available at http://www.nypost.com/p/news/local/nypd_in_a_liar_storm_qazMBEm3UNJVogv4Ndeqcl.
[5] Id.
[6] John Marzulli, *Claims of Corruption in Queens Precinct Put precinct Crooked Cop's Sentencing on Hold*, N.Y. Daily News, June 20, 2008, available at http://www.nydailynews.com/news/crime/claims-corruption-queens-precinct-put-crooked-sentencing-hold-article-1.296352.
[7] Id.
[8] John Marzulli, *Brooklyn cops charged with barging into sting operation, arresting a fellow officer*, N.Y. Daily News July 30, 2010, available at http://www.nydailynews.com/ny_loca112010/07/30/2010-07-30_brooklyn_cops_charged_with_barging_into_sting_operation_arresting_a_fellow_offic.html.

[10] Jim Hoffer NYPD Officer claims pressure to make arrests WABC-TV Eyewitness News, March 22 2010, available at http:J/abclocal.go.com/Wabc/story?section=news/investigators&id=73053S6 ("Police Officers like others who receive compensation are provided productivity goals and they are expected to work").

[11] Rocco Parascandola, *NYPD Lt. Janice Williams captured on tape pushing for more busts but brass says there's no quotas*, N.Y. Daily News, March 3, 2011.
[12] Id.
[13] James Fanelli, Cops at Brooklyn's crime-ridden 77th Precinct told to meet quotas for moving violations, memos say, N.Y. Daily News, Nov. 8, 2010.
[14] Tom Namako and Kirsten Fleming, *Nightime Riders in Big Sit Fit*, The New York Post. December 26, 2009, available at http://www.nypost.com/p/news/11/space_hogs_lapped_on_empty_subways.
[15] Rocco Parascandola, *Irate cops at the 79th Precinct in Bedford-Stuyvesant threaten boycott over quotas*, N.Y. Daily News, Dec. 12, 2010, available at http://www.nydailynews.com/news/12_bklyn_cops_threaten_tixwriting_boycott.
[16] Rocco Parascandola, *Deputy Chief Michael Marino threatens cops at the 79'h Precinct who want to go on summons strike*, N.Y. Daily News, Dec. 15,2010, available at http://www.nydailynews.com/ny_local/2010/12/15/2010-12-15_summons_strike_i_dare_ya_deputy.html.
[17] William J. Gorta, *Brooklyn Mom's Suit. Targets NYPD Arrest Quotas*, N.Y. Post, Feb. 15,.2011, at 6, available on Westlaw at 2011 WLNR 2986205; see also Oren Yaniv, *Capt. Links Arrests, Evaluation of Cops*, N.Y. Daily News, Feb. l5, 2011, at 20, also available on Westlaw at 20 WLNR 2986205.
[18] Oren Yaniv, *Court rules that cops do use quotas; woman injured in 2006 arrest settles for $75,000*, N.Y. Daily News. Feb. 19, 2011; available at http://www.nydailynews.com/news/ny_crime/201J/02119/2011-02.
[19] *New York City Ticket Quota Confirmed, Denied,* The Newspaper.Com, January 21, 2006, available at http://www.thenewspaper.com/news/09/914.asp; *see also*, Kirsten Cole. *NYPD's Bogus Little Secret: Parking ticket Quotas- Agents Often Caught Citing You For Violations You Didn't Commit*; WCBSTV.com, August 14, 2007, *available at* http://wcbstv.com/topstories/parking.ticket.blitz.2.246533.html.

[20] Allison Gendar *NYPD captain allegedly caught in arrest quota fixing*, The New York Daily News, November 14, 2007, available at http://www.nydailynews.com/news/ny_crime/2007/11/14/214_nypd_captain_allegedly_caught_in_arrest.
[21] Id. at *34.
[22] Mollen Commission Report, pp. 2-3, available at http://www.parc.info/client_files/Special%20Reports/4%20-%20Mollen%20Commissiono/%20-%20NYPD.pdf.
[23] Loren Yaniv and John Marzuli, *Kelly Shrugs Off Judge Who Slammed Cops*, New York Daily News, December 2, 2009, available at http://www.nydailynews.com/news/crime/police-commissioner-kelly-shrugs-judge-slammed-cops-article-1.433710.
[24] Rocco Parascandola et al, *Repeated Charges of Illegal Searches, Violence, Racial Profiling, Racial Slurs and Intimidation Against Lt. Daniel Sbarra and her Team Have Cost the City More Than $1.5 Million in Settlements*, N.Y. Daily News, May 19, 2013, available athttp://www.nydailynews.com/new-york/brooklyn/lt-daniel-sbarra-team-finest-article-1.1348075.
[25] In 2006, out of more than 10.000 allegations that were fully investigated, the CCRB substantiated only 594 (about 6%). In 2007, out of more than 11,000 allegations that were fully investigated the CCRB substantiated only (about 5%). See, CCRB Jan.-Dec. 2007 status Report at p. 19, available at http://www.nyc.gov/html/ccrb/pdf/ccrbann2007_A.pdf. Upon information and belief, the low rate of substantiated complaints is due in part to the above-noted de facto policy and/or well-settled and widespread custom and practice in

the NYPD whereby officers refuse to report other officers' misconduct or tell false and/or incomplete stories inter alia sworn testimony and statements given to the CCRB, to cover-up civil rights violations perpetrate by themselves or fellow officers, supervisors and/or subordinates.

[26] Christine Hauser, *Few Results for Reports of Police Misconduct*, New York Times, October 5, 2009 at A19.

[27] Daily News, *Editorial: City Leaders Must Get Serious About Policing the Police*, August 20, 2008.

[28] Al Baker, *Bronx Police Precinct Accused of Using Quota System*, N.Y. Times, Feb. 24, 2012, available

at      http://www.nytimes.com/2012/02/24/nyregion/lawsuit-says-bronx-police-precinct-uses-quota-system.html?_r=0.

[29] Id at 389-92. See also Joseph Goldstein, Officers, Exhorted to Report Corruption, Still Fear Retaliation, N.Y. Times, June 25, 2012, available at http://www.nytimes.com/2012/06/25/nyregion/new-york-police-officers-face-retaliation-for-reporting-corruption.html?partner=rss&emc=rss&pagewanted=all.